**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JONATHAN HYSLOP**,<br><br>Plaintiff,<br><br>v.<br><br>**TOWNSHIP OF WEST WINDSOR, *et al.***,<br><br>Defendants. | Civil Action No. 25-15658 (ZNQ) (JTQ)<br><br>**OPINION** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon Motions to Dismiss filed by each of the following Defendants: (i) Mercer County (the "County") ("County Motion," ECF No. 77); (ii) Antonio J. Toto and the Law Office of Antonio J. Toto (collectively, "Toto") ("Toto Motion," ECF No. 80); (iii) Detective Jason Jones ("Jones"), Chief Robert Garofolo ("Garofolo"), and the Township of West Windsor (the "Township," and together with Jones and Garofolo, the "Township Defendants") (the "Township Defendants' Motion," ECF No. 81); (iv) Mercer County Prosecutor Theresa L. Hilton ("Hilton") and Assistant Mercer County Prosecutor Timothy Ward ("Ward") (the "Hilton Motion," ECF No. 83); (v) Matthew Marcotte ("Marcotte Motion," ECF No. 114); and (vi) Sargeant James Chianese ("Chianese Motion," ECF No. 115) (the County, Toto, the Township Defendants, Hilton, Marcotte, and Chianese are collectively referred to hereinafter as "Defendants" and their Motions are collectively referred to hereinafter as the "Motions"). Defendants each filed a brief in support of their respective Motion. (ECF No. 77-1, "County Moving Br."; ECF No. 80-1, "Toto Moving Br."; ECF No. 81-2, "Township Defendants' Moving

Br."; ECF No. 83-1, "Hilton Moving Br."; ECF No. 114-1, "Marcotte Moving Br."; ECF No. 115-2, "Chianese Moving Br.") Plaintiff Jonathan Hyslop ("Plaintiff"), *pro se*, filed opposition to each of the Motions, (*see* ECF No. 87, "County Opp'n Br."; ECF No. 90, "Toto Opp'n Br."; ECF No. 89, "Township Defendants Opp'n Br."; ECF No. 91, "Hilton Opp'n Br."; ECF No. 117, "Marcotte Opp'n Br."; ECF No. 118, "Chianese Opp'n Br.")[1], to which all Defendants — except Toto replied (ECF No. 106, "County Reply Br."; ECF No. 107, "Township Defendants' Reply Br."; ECF No. 96, "Hilton Reply Br."; ECF No. 120, "Marcotte Reply Br."; ECF No. 119, "Chianese Reply Br.".)

The Court has carefully considered the parties' submissions and decides the Motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motions to Dismiss will be **GRANTED**.

## I. <u>BACKGROUND AND PROCEDURAL HISTORY</u>

This case stems from a domestic dispute between Plaintiff and Marisan Vicente ("Vicente") that occurred on April 4, 2023 at Plaintiff's apartment building (the "April 4 Incident" or the "Incident"). (First Amended and Supplemental Complaint ("FASC") ¶¶ 26–34.) Plaintiff brings 19 claims against a host of individuals, government officials, and municipalities based on their conduct in connection with the aftermath of this dispute spanning over the following two years.

### <u>The April 4 Incident</u>

On April 4, 2023, Plaintiff and Vicente purportedly had a verbal argument inside their apartment. (*Id.*) The dispute continued into the parking lot of the apartment complex when Vicente left the apartment and went to her car; Plaintiff followed her purportedly believing that

[1] Plaintiff did not paginate his Opposition Briefs. The Court therefore cites to the page numbers generated by the CM/ECF system.

his belongings were in her car. (*Id.*) After Vicente entered her car, Plaintiff walked behind the trunk area of her car and thereafter walked toward the driver's side door, at which point Vicente exited her vehicle. (*Id.*) As the dispute continued, Plaintiff walked back toward his apartment and Vicente followed — a neighbor of Plaintiff's, Ali Khan ("Khan"), had overheard and observed part of the dispute and attempted to dissuade Vicente from pursuing Plaintiff. (*Id.*) Ultimately, Vicente followed Plaintiff toward his apartment to attempt to retrieve her keys from Plaintiff, causing a struggle between them over the keys. (*Id.*) Plaintiff alleges Vicente sustained cuts to her hand consistent with grabbing her keys during the struggle. (*Id.*) Two neighbors called 911 to report the ongoing dispute — Khan and Andrew Marcotte ("Marcotte"). (*Id.*) Marcotte allegedly reported "Yeah, he's hitting her," during his 911 call. (*Id.*) In response to the 911 calls, West Windsor Police arrived on the scene, purportedly with their firearms drawn. (*Id.*) Ultimately, the dispute was dissipated, and Plaintiff was not arrested that day. (*Id.*) Police officers interviewed Vicente after the dispute had ended, at which time Vicente denied that Plaintiff assaulted her. (*Id.*)

**<u>Plaintiff Files a Civil Complaint with the West Windsor Township Police Department</u>**

On April 6, 2023, Plaintiff filed a written civil complaint with the West Windsor Township Police Department ("WWTPD") regarding their response to the April 4 Incident based on their display of firearms upon arriving at the scene (the "Civil Complaint"). (*Id.* ¶ 35.) Plaintiff alleges that Jones handled the Civil Complaint, acknowledged receipt in writing on April 7, 2023 and requested that Plaintiff contact him for an interview regarding the complaint. (*Id.* ¶¶ 36–37.) Plaintiff avers that Jones was also leading the investigation into the April 4 Incident. (*Id.* ¶¶ 38.)

**<u>Video Evidence of the April 4 Incident</u>**

Plaintiff alleges there are two pieces of surveillance evidence documenting the April 4 Incident. (*Id.* ¶¶ 39–51.) First, Plaintiff alleges that surveillance footage depicting the portion of

the incident in the apartment's parking lot shows that Plaintiff did not restrain Vicente, Vicente chased Plaintiff toward the apartment, and Vicente initiated physical contact with Plaintiff. (*Id.*) Second, Marcotte allegedly presented audio recordings to Jones during a witness interview on April 19, 2023 regarding Marcotte's recount of the Incident which recorded part of the verbal dispute that occurred inside Plaintiff's apartment. (*Id.*) During that interview, Jones told Marcotte "I was able to get video footage . . . what it doesn't give me is anything in the hallway . . . that's kind of where you come in . . . now I'm just trying to tie it together with the inside piece." (*Id.*) Plaintiff alleges that Marcotte stated that he had a recording "from inside of our apartment . . . that [he] took . . .". and that he purportedly recorded "at least once a week" for months to "be able to hear if it got physical," between Plaintiff and Vicente. (*Id.*) Plaintiff alleges that Jones procured this recording from Marcotte during the interview. (*Id.*)

**Jones Interviews Vicente About the April 4 Incident**

On April 20, 2023, Jones interviewed Vicente about the Incident, at which time Plaintiff alleges that Vicente denied that Plaintiff assaulted her, stating that "He doesn't . . . put his hands on me," and described the Incident as involving a struggle over keys. (*Id.* ¶¶ 52–56.) Plaintiff alleges that the interview was not disclosed to Plaintiff's defense. (*Id.*) Jones told Vicente not to tell Plaintiff about this interview. (*Id.*)

**Plaintiff is Arrested on Assault and False Imprisonment Charges**

On April 21, 2023 Jones arrested Plaintiff on assault and false imprisonment charges relating to the Incident (the "April Arrest"). (*Id.* ¶¶ 57–72.) During Plaintiff's transport, Jones purportedly told Plaintiff that he had run the case by Garofolo, the Chief of Police for WWTPD, and received approval to proceed with arresting Plaintiff. (*Id.*) Plaintiff was processed and released on the following conditions: (i) a no-contact restriction with Vicente and restrictions

affecting his residence; and (ii) a requirement to undergo a psychiatric evaluation and comply with related requirements during the pendency of the case. (*Id.*) Plaintiff alleges that, as a result, he was excluded from his residence for approximately thirty days, during which time Vicente was able to retrieve her belongings from their apartment. (*Id.*)

In May 2023, Jones was present when Vicente went to retrieve her belongings from Plaintiff's apartment, and Plaintiff alleges that when Vicente tried to write Plaintiff a letter, Jones told her that she could not. (*Id.*) Thereafter, on July 7, 2023, Vicente purportedly provided a notarized statement which stated in substance "that Plaintiff did not hit her, injuries were self-inflicted, Plaintiff did not confine her, and Plaintiff should not have been arrested." (*Id.*) It is unclear in the FASC whether that statement was submitted to anyone, including Jones. Plaintiff also emailed Jones on August 1, 2024 reiterating that Plaintiff did not hit her, Marcotte's account of the Incident was fabricated, Marcotte was not present in the hallway during the Incident, and alleging that the April Arrest was related to Plaintiff's Civil Complaint. (*Id.*)

**<u>Plaintiff Files a Citizen Complaint Against Marcotte</u>**

In May 2024, Plaintiff filed a citizen complaint with the Mercer County Prosecutor's Office ("MCPO") against Marcotte, notifying the MCPO that Marcotte recorded conversations in his apartment building (the "Citizen Complaint"). (*Id.* ¶¶ 73–78.) Upon receipt and review of the Citizen Complaint, Ward responded in writing to Plaintiff stating that there was no evidence of a crime. (*Id.*)

**<u>Plaintiff's Prosecution in Connection with the April 4 Incident is Dismissed</u>**

In April or May 2023, Plaintiff retained Toto to represent him in the municipal criminal matter stemming from the Incident and Plaintiff's subsequent arrest for assault and false imprisonment during the Incident (the "Criminal Case"). (*Id.* ¶¶ 79–91.) On May 2, 2023, Plaintiff

purportedly notified Toto that he wanted to sue the police department, but Toto did not advise him to serve a Notice of Tort Claim. (*Id.*) During his representation of Plaintiff in the Criminal Case, Plaintiff alleges that Toto misrepresented his submission of Vicente's written statement to the court, failed to challenge restrictions on the defense's access to Vicente, concealed the dismissal of the Criminal Case (which was dismissed on December 15, 2024) for approximately 227 days, and refused to disclose insurance information to Plaintiff. (*Id.*) Plaintiff also alleges that when he sought to engage in settlement discussions with Toto in November 2025, Toto refused to place his insurance carrier on notice, characterized Plaintiff's claims as frivolous, threatened to seek fees against Plaintiff, and referenced the Affidavit of Merit Statute. (*Id.*)

**Plaintiff's Conduct in August 2025**

In early August 2025, Plaintiff filed a Notice of Tort claim relating to the April 2023 events. (*Id.* ¶ 92.) On August 15, 2025, Plaintiff sent Marcotte a written communication which he states was for "pre-litigation settlement" purposes and did not threaten violence or extra-legal harm. (*Id.* ¶¶ 93–94.) The communication referenced Plaintiff's intent to pursue remedies, but did not threaten any false report, fabrication allegation, or misuse of process. (*Id.* ¶¶ 93–96.) On August 24, 2025, Plaintiff was arrested on charges of theft-by-extortion and witness tampering premised on this communication, and "during arrest/processing, law enforcement seized Plaintiff's iPhone . . . [which] has remained retained," (the "August Arrest"). (*Id.* ¶¶ 97–98.) On August 25, 2025, when Plaintiff was being discharged from the Mercer County Correctional Facility (the "Corrections Facility"), Sergeant James Chianese, a Mercer County corrections officer at the Correctional Facility, said to Plaintiff: "If you ever complain about us in a message like that again, you come back into custody here. We're going to fuck you up," (the "Jail Threat"). (*Id.* ¶¶ 99.)

After the Jail Threat, Plaintiff made a request with the County pursuant to New Jersey's Open Public Records Act ("OPRA") for information relating to "intake/Receiving & Discharge rosters, logs, and related records that would identify supervising staff on duty during the relevant time window." (*Id.* ¶¶ 100–104.) Plaintiff alleges that the County's response was deficient because the County "used reference-number handling, 'duplicate request' characterizations, and/or other administrative tactics that delayed or impeded timely production and meaningful identification." (*Id.*) Plaintiff alleges that he mailed a second Notice of Tort Claim dated September 16, 2025 in connection with his August Arrest and the Jail Threat. (*Id.* ¶ 107.)

On September 15, 2025, Plaintiff filed suit before the Court. (ECF No. 1.) That same day, Plaintiff filed three motions: (i) for a temporary restraining order and preliminary injunction against Defendants (ECF No. 3); (ii) for expedited discovery (ECF No. 4); and (iii) to appoint pro bono counsel (ECF No. 5.) The Court denied each motion. (ECF Nos. 7, 11.) Moreover, on December 23, 2025, the Court granted an extension of time for Plaintiff to serve Toto with an Affidavit of Merit ("AOM") pursuant to N.J.S.A. 2A:53A–27 until March 6, 2026. (ECF No. 60.) Plaintiff thereafter filed the FASC on January 7, 2026. (ECF No. 61.) Notably, Toto answered the FASC on January 22, 2026. (ECF No. 69.) On January 25, 2026, Plaintiff moved for an order stating that no AOM was required to be served on Toto. (ECF No. 74.) The Court denied that motion on February 26, 2026. (ECF No. 100.) The present motions followed.

## II. SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction over Plaintiff's claims under federal law pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his claims under state law pursuant to 28 U.S.C. § 1367.

## III. LEGAL STANDARD

A district court may grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. When considering a motion under 12(b)(6), the "defendant bears the burden of showing that no claim has been presented." *Hedges v. U.S.*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)). Moreover, the court must accept as true all the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted); *Dluhos v. Strasberg,* 321 F.3d 365, 369 (3d Cir. 2003) (emphasizing that *pro se* complaints should be construed liberally). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 663).

"To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993); *see also Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). "However, an exception to the general rule is that a 'document *integral to or explicitly relied* upon in the complaint' may be considered 'without converting the motion to dismiss into one for summary judgment.'" *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997). To that end, courts may also consider

"undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## IV. DISCUSSION

### A. PLAINTIFF'S CIVIL RIGHTS CLAIMS (COUNTS I—IX, XII, XIV)

#### 1. Count I – Malicious Prosecution (Jones and Garofolo)

Plaintiff's first claim is against Jones and Garofolo for malicious prosecution in connection with the April Arrest of Plaintiff for false imprisonment and simple assault. To state claim for malicious prosecution under 42 U.S.C. § 1983 ("Section 1983"), a plaintiff must set forth sufficient facts to demonstrate that: "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in [the] plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Lozano v. New Jersey*, 9 F. 4th 239, 247 (3d Cir. 2021) (internal quotations omitted). In New Jersey, if a person "knowingly restrains another unlawfully so as to interfere substantially with his liberty" that person has committed false imprisonment. N.J.S.A. 2C:13-3. Simple assault is codified at N.J.S.A. 2C:12-1(a)(1), which makes a person guilty of assault if the person "[a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury to another."

The parties primarily dispute whether Jones and Garofolo had probable cause to arrest Plaintiff on assault and false imprisonment charges. "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995).

To the extent that Jones and Garofolo describe or cite to evidence in their briefing that is not contained or referenced in the FASC, the Court does not consider it. The Court further omits such extraneous theories and purported evidence from this Opinion. Setting aside facts outside the pleadings, the Court recounts the FASC allegations that align with the evidence that Jones and Garofolo believe supports the theory of probable cause for the April Arrest and prosecution: (i) 911 call from Marcotte wherein he reported that Plaintiff was hitting Vicente, (FASC ¶ 32); (ii) 911 call from Khan wherein he reported the same dispute, (*id.* ¶ 31); (iii) Vicente's April 20, 2023 statement, wherein Vicente allegedly denied that Plaintiff assaulted her, but nonetheless described the April Incident "as involving a struggle over keys," (*id.* ¶ 53); (iv) surveillance footage showing that after Vicente entered her car, "Plaintiff walk[ed] to the trunk area and then toward the driver's side door," (*id.* ¶ 28); and (v) Vicente's attempt "to retrieve her keys from Plaintiff[, which resulted in] a brief struggle over keys[, and] Vicente sustained minor cuts to her hand consistent with gripping keys during the struggle," (*id.* ¶ 30.) (*See* Township Moving Br. at 19–20); (*see generally* FASC ¶¶ 26–34.)

Plaintiff argues that the Township's assertions present factual disputes that cannot be resolved at this stage, especially because the FASC "pleads contrary evidence, concealment of exculpatory material, and continuation of prosecution for twenty months after the victim herself denied the assault." (Township Opp'n Br. at 11–12 ("the FA[S]C alleges the video shows Vicente voluntarily exiting her vehicle and following Plaintiff back toward the building . . . the FA[S]C alleges that the victim herself repeatedly denied any assault . . . [and] Marcotte's account—is alleged to have been based on a fabricated vantage point and contaminated by coaching.").)

At this stage, the Court need not resolve any factual disputes. As set forth above, Plaintiff must allege the elements of a malicious prosecution claim, including that the proceeding was

initiated without probable cause. Plaintiff's complaint does not plausibly plead this element. The FASC effectively concedes probable cause insofar as it alleges that "Vicente attempted to retrieve her keys from Plaintiff; there was a brief struggle over keys. Vicente sustained minor cuts to her hand consistent with gripping keys during the struggle." (FASC ¶ 30.) More damning, the FASC alleges that during his 911 call — and obviously before the purported "witness coaching" occurred according to Plaintiff (*id.* ¶¶ 42–44, 125) — Marcotte "reported words to the effect of: 'Yeah, he's hitting her[,]'" (*id.* ¶ 32.) Vicente's subsequent denial that Plaintiff assaulted her does not automatically defeat the probable cause for the April Arrest. The probable cause "standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467–68 (3d Cir. 2016). As the Third Circuit explained in *Dempsey*,

> the Supreme Court has observed, [i]n dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. For this reason, the Court has eschewed any rigid demand that specific tests be satisfied and has instead prescribed a totality-of-the-circumstances approach to the probable cause determination.

*Id.* (quotations and citations omitted).

Plaintiff also misunderstands the weight of Vicente's denial that he assaulted her. While her denial does merit consideration, it is not dispositive, particularly in a domestic violence situation. The New Jersey Supreme Court has succinctly observed in this context that:

> Given the dynamics of domestic violence and the frequency with which victims themselves do not reach out to the police for assistance, it is critical that law enforcement officers be able to rely on concerned citizens' reports of domestic violence, as verified by a review of the totality of the circumstances, in order to arrest an alleged abuser. Certainly, an officer should consider the statement of a victim when reviewing the totality of the circumstances. However, where the officers investigating an alleged incident of domestic violence observe a weapon at the scene and an injury to the victim, and where statements other than that of the victim support a belief that a domestic violence incident occurred, the law enforcement officer could reasonably conclude that there is probable cause to arrest the alleged batterer.

*Wildoner v. Borough of Ramsey*, 744 A.2d 1146, 1158 (N.J. 2000) (reversing and remanding for dismissal a § 1983 claim brought by an arrestee).

Because Plaintiff fails to plead a lack of probable cause, the Court will dismiss Count I against Jones and Garofolo without prejudice. For the same reasons, the Court will also *sua sponte* dismiss Plaintiff's claim for false arrest/false imprisonment (Count II).[2]

2. Counts III & VI – First Amendment Retaliation (Jones, Garofolo, John Doe Officers 1-10, and Chianese), and Abuse of Process, Violation of the Fourth and Fourteenth Amendments (Jones, Garofolo, and John Doe Officers 1-10)

For his third and sixth claims, Plaintiff alleges that Jones, Garofolo, unnamed officers, and Chianese retaliated against Plaintiff for speech protected by the First Amendment by improperly abusing criminal process. Jones and Garofolo move to dismiss both claims as they relate to the April Arrest and ensuing prosecution on the basis that the claims are barred by the relevant statute of limitations. The Court agrees.

"In determining the length of the statute of limitations for a claim arising under § 1983, courts must apply the limitations period applicable to personal-injury torts in the State in which

[2] Plaintiff asserts a false arrest/false imprisonment claim (Count II) against the arresting John Doe officers. Although none of the named defendants technically moved to dismiss that claim, the Court will nonetheless exercise its authority to dismiss Count II because it too similarly requires pleading that the arrest was made without probable cause. *See James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012).

the cause of action arose. *Wallace v. Kato,* 549 U.S. 384, 387 (2007). Here, Plaintiff's claims are based on personal injury and arose in New Jersey. Therefore, New Jersey's two-year statute of limitations period on personal injury actions governs. N.J.S.A. 2A:14–2.

However, "the accrual date of a federal cause of action, as stated earlier, is calculated under federal law, not state law." *Kach v. Hose*, 589 F.3d 626, 641 n.16 (3d Cir. 2009). "Under federal law, a cause of action accrues, and the statute of limitations begins to run, "when the plaintiff knew or should have known of the injury upon which its action is based." *Id.* (quoting *Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998) (citation omitted)). "As a general matter, a cause of action accrues at the time of the last event necessary to complete the tort, usually at the time the plaintiff suffers an injury. The cause of action accrues even though the full extent of the injury is not then known or predictable. Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief." *Id.* (citations and quotations omitted). To be sure, "the defendant bears the burden of establishing that a statute of limitations affirmative defense applies, and claims may be dismissed as untimely on a Rule 12(b)(6) motion only if the time bar is apparent on the face of the complaint." *Hurley v. Hillsborough Twp. Board of Education*, 2025 WL 1531229, at *4 (D.N.J. May 29, 2025).

The parties dispute when the statute of limitations period began to run on these claims. Jones and Garofolo assert that Plaintiff's claims, insofar as they relate to the April Arrest, began accruing on the date of arrest, more than two years prior to the filing of this lawsuit on September 15, 2025, and are therefore time-barred. The Court agrees. That the Criminal Case continued through early 2024 before being terminated does not toll the limitations period because all the related events occurred in or around April 2023. (FASC ¶ 123.) Plaintiff knew or should have

known of his alleged injury from this prosecution (i.e., that it was purportedly retaliatory and unlawful) on or around the date of his arrest. *See Rose v. Bartle*, 871 F.2d 331, 350 (3d Cir. 1989) ("[A] section 1983 claim for false arrest accrues on the date of the arrest, as does a section 1983 claim for abuse of process, because on that date a plaintiff would have reason to know of the injury which those two torts encompass.") (quotations omitted). Plaintiff's claims under Counts III and VI insofar as they relate to the April 2023 events will be dismissed with prejudice.

Plaintiff's claims against Garofolo and Jones stemming from his August 2025 arrest are not barred by the statute of limitations, but they suffer from another defect. He alleges no involvement by either Garofolo or Jones in that particular arrest. (*See* FASC ¶¶ 97–98.) Accordingly, these aspects of Plaintiff's claims against Garofolo and Jones are dismissed without prejudice for failure to state a claim.

Chianese, also named in Count III, moves to dismiss that claim on the basis that he is improperly named as a defendant in this lawsuit. Chianese argues that if Plaintiff cannot even identify with certainty that Chianese was the corrections officer who issued the Jail Threat, then Count III cannot be sustained against Chianese. (Chianese Moving Br. 2–4); (*see* FASC ¶ 17 ("If discovery shows a different individual . . . [then] Plaintiff will amend to conform to the evidence.").) In support, Chianese submits the Certification of Sgt. James Chianese, ECF No. 115-1 ("Chianese Cert."), wherein Chianese certifies that he "did not 'threaten Plaintiff under color of law on August 25, 2025[, and] had no conversations with Plaintiff on the date in question." (Chianese Cert. ¶ 5.) Plaintiff's opposition to this contention is based on facts not alleged in the FASC, and therefore the Court declines to consider them. (Chianese Opp'n Br. at 3 (stating that Plaintiff recalls the relevant officer's name tag included the "CHIA" prefix and that Chianese was supposedly involved in record-keeping of the Corrections Center).) Chianese also moves to

dismiss this claim based on qualified immunity for the Jail Threat because no constitutional violation occurred in connection with the Jail Threat. (Chianese Moving Br. at 9–12.) Plaintiff argues that the Jail Threat was intended to chill protected speech and petitioning. (Chianese Opp'n Br. at 4 (citing FASC ¶ 99).) For the reasons set forth below, the Court agrees with Chianese that the Jail Threat did not constitute a constitutional violation and therefore will dismiss Count III against Chianese.

As stated, the essence of Count III, insofar as it relates to Chianese, is that the Jail Threat was a retaliatory act against Plaintiff's First Amendment protected speech. The Third Circuit has established the applicability of qualified immunity to government actors:

> The doctrine of qualified immunity insulates government officials who are performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The Supreme Court has established a two-part analysis that governs whether an official is entitled to qualified immunity. We ask: (1) whether the facts alleged by the plaintiff show the violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the alleged misconduct. Courts may address the two [ ] prongs in any order, at their discretion. **If the plaintiff fails to satisfy either prong, the defendant is entitled to judgment as a matter of law**.

*James*, 700 F.3d at 679 (citations and interior quotation marks omitted) (emphasis added).

Plaintiff's claim for retaliatory conduct against Chianese is barred by the doctrine of qualified immunity because Plaintiff fails to allege that the Jail Threat was unconstitutional, *see infra*, Point IV(A)(7)(c). Count III against Chianese will be dismissed without prejudice.

As best the Court can discern, what remains of Counts III and VI are the claims against John Doe arresting officers for Plaintiff's August 2025 arrest on charges of extortion and witness tampering. (FASC ¶ 97.) Plaintiff explicitly alleges there was no probable cause for his arrest for witness tampering, but does not explicitly allege there was no probable cause for extortion. (*Id.*)

The arrest purportedly flowed from a letter Plaintiff sent to Marcotte before his arrest in August 2025. (*Id.* ¶ 93.) Plaintiff alleges the letter was "a written, pre-litigation settlement communication concerning Plaintiff's asserted civil claims, and requested insurance information and/or routing communications through counsel." (Id. ¶ 93.) He alleges the communication "was expressly framed as settlement/petitioning activity and did not threaten violence or any extra-legal harm." (*Id.* ¶ 94.) Plaintiff does not attach a copy of the August 2025 letter to Marcotte to his Complaint.[3]

While the Court is obligated to accept as true all facts alleged in a plaintiff's complaint on a motion to dismiss, it "need not credit either bald assertions or legal conclusions." *Evancho v. Fisher*, 423 F.3d 347 (3d Cir. 2025) (interior quotation marks omitted). Rather than attaching the August 2025 letter to Marcotte or even disclosing any of its content, Plaintiff alleges the letter was only a settlement communication and cannot have served as probable cause for his arrest for extortion. This is both a bald assertion and a proffered legal conclusion. Accordingly, the Court finds that Plaintiff has failed to state a claim against the John Doe officers for his August 2025 arrest. That portion of his Complaint will therefore be dismissed without prejudice.

3. Counts IV & V – Fabrication / Use of False Evidence, Violation of the Fourteenth Amendment (against Jones, Garofolo, Marcotte, and John Doe Officers 1-10), and Suppression / Interference with Material Favorable Evidence and Access to a Key Witness, Violation of the Fourteenth Amendment (against Jones, Garofolo, and John Doe Officers 1-10)

In Counts IV and V, Plaintiff alleges that Jones, Garofolo, and Marcotte fabricated and used false evidence to manufacture probable cause to initiate and maintain criminal proceedings against Plaintiff. Plaintiff alleges that such unlawful conduct amounted to witness coaching, false imprisonment charges against Plaintiff despite contradicting video, and use of an interception-derived narrative while disregarding reliability issues and victim-denial evidence. Jones and

[3] For reasons unclear, none of the parties appear to have submitted the August 2025 letter to the Court for consideration on the various motions.

Garofolo move to dismiss these claims on the grounds that the FASC fails to allege any instances of evidence fabrication or suppression of favorable evidence. The Court agrees.

As set forth above, Plaintiff has not plausibly pled that Jones and Garofolo lacked probable cause to arrest Plaintiff on charges of assault and false imprisonment on April 21, 2023. Plaintiff fails to allege that any of the evidence supporting that probable cause was fabricated to support the charges. Furthermore, Plaintiff's bald allegation that Marcotte's meeting with Jones constituted witness coaching does not suffice. (FASC ¶¶ 42–51.) Nor does Plaintiff's interpretation of the surveillance footage, (*id.* ¶¶ 39–41), because Plaintiff concedes that he possessed Vicente's car key and refused to surrender it during the dispute, (*id.* ¶ 30.) Lastly, Plaintiff's allegations that Jones (i) told Vicente "Don't let him know that we spoke," (ii) denied Plaintiff's access to Vicente in connection with the Criminal Case, and (iii) purportedly told Vicente not to write Plaintiff a letter when he escorted her to Plaintiff's apartment to retrieve her belongings fail to plausibly plead suppression of favorable evidence. (*Id.* ¶ 130.)

Counts IV and V of the FASC will be dismissed without prejudice.

4. <u>Count VII – Fourth and Fifth Amendment Violations (against the County)</u>

In Count VII, Plaintiff brings a Section 1983 claim for unreasonable seizure and retention of property in violation of the Fourth Amendment and deprivation without due process under the Fifth Amendment based on his allegations that his "iPhone was seized during the August 2025 arrest/processing and has been retained", and that "continued retention is unreasonable, particularly where investigative needs could be satisfied through imaging/extraction, and where retention substantially interferes with Plaintiff's communications and litigation preparation." (FASC ¶ 134.) Plaintiff alleges that the County's "procedures for return of seized phones were unconstitutionally inadequate and caused prolonged deprivation without due process." (*Id.* ¶ 136.) The County flatly denies the factual accuracy of this claim, arguing that the property receipt forms

signed by Plaintiff upon his intake (on August 24, 2025) and discharge from the Corrections Facility (on August 25, 2025) confirm that Plaintiff "received all personalty that he had brought with him to the facility." (County Moving Br. at 3 (citing Certification of Paul R. Adezio, ECF No. 77-2 ("Adezio Cert. 1"), Exhibit A ("the Property Receipts").) Without disputing the authenticity of the Property Receipts, Plaintiff argues that the Property Receipts may not be considered at the motion to dismiss stage because Plaintiff's seizure claim is not based on them, (County Opp'n Br. at 8), and even if they are considered at this stage, the FASC "alleges that Plaintiff's iPhone was seized during arrest and processing, by law enforcement — not that it was seized by the jail[,]" (*id.* at 9); (FASC ¶ 98).) In support, Plaintiff notes that an iPhone or cellular phone is not listed on the Property Receipts. (County Opp'n Br. at 8.) In response, the County contends that Plaintiff's assertion that his iPhone was seized during his arrest by the West Windsor Township Police Department ("WWTPD") is of no consequence to the County, apparently asserting that the County is not responsible for items seized by WWTPD officers during the arrest, but rather only items seized at the jail during processing. (County Reply Br. at 2–3.) Thus, the County argues that Plaintiff cannot maintain this claim against it because the County is not implicated by the conduct of the WWTPD. The Court agrees with the County.

The Court finds that Plaintiff has failed to state Fourth and Fifth Amendment claims against the County. As noted, on a motion to dismiss the Court may consider undisputedly authentic documents if the complainant's claims are based on these documents. *Mayer*, 605 F.3d at 230. Plaintiff does not dispute the authenticity of the Property Receipts, or that he signed them upon intake and discharge of his detention. Therefore, it is undisputed that the Property Receipts accurately reflect all personal property that Plaintiff had in his possession when he was admitted to, and upon his release from, the Corrections Facility in August 2025 — and further that none of

the items listed on the Property Receipts are an iPhone or cellular device. To that end, Plaintiff's Fourth and Fifth Amendment claims against the County are necessarily based on, and belied by, the undisputedly authentic Property Receipts and the fact that those receipts make no record of the County possessing Plaintiff's iPhone. Plaintiff has not stated a claim *that the County*, who controlled intake and discharge at the Corrections Facility, unconstitutionally seized or retained his property, or that the County has done so without due process. To the extent Plaintiff's allegation is that WWTPD officers seized and retained his iPhone during the August 2025 Arrest, Plaintiff fails to tie that conduct to the County. To be sure, the FASC alleges that the Township is responsible for the training and discipline of WWTPD officers, (FASC ¶ 12), while the County is allegedly responsible for "jail operations alleged [in the FASC]" in connection with the Corrections Facility, (*id.* ¶ 16.)

The Court will dismiss Count VII against the County without prejudice.

5. <u>Count VIII – *Monell* Liability (against the Township and the County)</u>

Plaintiff brings a *Monell* liability claim in Count VIII against the Township and the County based on the allegation that the Township and the County maintained policies, customs or practices that permitted unconstitutional conduct against Plaintiff. The unconstitutional conduct that Plaintiff alleges to support Count VIII amounts to Garofolo's and Jones' decision to proceed with Plaintiff's arrest and prosecution, and the corrections officer's purported verbal threat to Plaintiff upon his discharge from the Corrections Facility in August 2025. (FASC ¶¶ 138–141.)

*a) Monell Liability*

To begin, the Court addresses the applicability of the *Monell* doctrine: "To find [a] municipality liable under § 1983, a plaintiff must prove the existence of a policy or custom that resulted in a constitutional violation." *Monell v. Dep't. of Soc. Servs. of City of New York*, 436 U.S. 658, 694–95 (1978). Liability "must be founded upon evidence that the government unit

itself supported a violation of constitutional rights." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).). "A plaintiff can show the existence of a policy when a decisionmaker with final authority 'issues an official proclamation, policy, or edict'." *Hines v. Borough of Belmar*, 2025 WL 2165021, at *9 (D.N.J. July 30, 2025) (quoting *Bielevicz*, 915 F.2d at 850). "Importantly, municipal liability under § 1983 requires an underlying constitutional violation. *Hines*, 2025 WL 2165021 at *9 (citing *Monell*, 436 U.S. at 690–91). Indeed, absent a constitutional violation, "there can be no derivative municipal claim." *See Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 245 n.15 (3d Cir. 2013); *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (noting that if a municipal employee "inflicted no constitutional injury . . . it is inconceivable that [the municipality] could be liable"). The Court is persuaded that Plaintiff fails to allege an existing policy violation of the Township or the County, and that Plaintiff also fails to allege conduct rising to the level of a constitutional violation.

*b) The Township's Motion*

The Township and Garofolo move to dismiss Count VIII on the basis that the FASC does not establish "a municipal policy, custom or practice that was the 'moving force' behind the alleged constitutional injury." (Township Moving Br. at 30–31.) Specifically, Plaintiff alleges that the Township "maintained policies/customs and/or a failure-to-train/supervise discipline regime that was a moving force behind the constitutional violations alleged, including: (a) failing to train and supervise officers on preserving and disclosing victim-denial evidence and correcting charges contradicted by objective video; (b) permitting solicitation/procurement/use of unlawfully intercepted communications without investigation of the interceptor; and (c) permitting retaliation against complainants." (FASC ¶ 138.) Plaintiff further alleges that "Jones represented that Garofolo approved ('green-lighted') proceeding with arrest/prosecution despite victim-denial

evidence and video undermining a charged theory, supporting policymaker knowledge and ratification of the challenged conduct." (*Id.* ¶ 139.)

The Township characterizes Plaintiff's allegations as "formulaic recitations—'failure to train and supervise officers,' 'permitting solicitation of unlawfully intercepted communications,' and [']permitting retaliation against complainants'" while "provide[ing] no non-conclusory facts demonstrating such customs existed or were widespread." (Township Moving Br. at 30–31.) The Township avers that even if these allegations do establish applicable policies, Plaintiff nonetheless fails to show that they were the "moving force" behind his injury, (*id.* (citing *Bd. of County Commissioners v. Brown*, 117 S.Ct 1382, 1388 (1997)), because Plaintiff "merely states the municipality 'approved' or 'ignored' misconduct—precisely the 'naked assertions devoid of further factual enhancement' the Supreme Court [has] rejected[,]" (*id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).) Plaintiff disputes these points, claiming that the FASC alleges "malicious prosecution, retaliation, fabrication, suppression/interference, abuse of process, supervisory liability, conspiracy, and wiretap violations." (Township Opp'n Br. at 20–21 (citing FASC ¶ 138.) Moreover, Plaintiff asserts that Garofolo's approval to proceed with Plaintiff's arrest, notwithstanding victim-denial evidence, constitutes policymaker ratification and a reflection of the Township's customs and practices. (*Id.* (citing FASC ¶ 140).)

The Court begins its inquiry with an examination of whether Plaintiff has alleged a custom or policy of the Township, or a causal link between a Township decisionmaker and the purported unconstitutional conduct. *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009) (To survive a motion to dismiss a claim for municipal liability under Section 1983, a plaintiff must "identify a custom or policy, and specify what exactly that custom or policy was."). Drawing all

factual inferences in favor of Plaintiff, as is required at this juncture, the Court concludes that the FASC alleges municipal liability.

In this regard, the Court initially determines that Plaintiff's claims that the Township failed to train and supervise officers, permitted solicitation of unlawfully intercepted communications, and permitted retaliation against complainants are not prescribed customs or policies, but rather conclusory allegations that generically embody Plaintiff's specific claims. These allegations cannot "'fairly be said to represent official policy,' warranting the imposition of municipal liability." *Id.* at 659 (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986) (quoting *Monell,* 436 U.S. at 694)).

However, the Court reaches a different conclusion upon review of Plaintiff's allegation that Garofolo, as Chief of Police of the WWTPD, approved the April Arrest for assault and imprisonment charges, and that the arrest and prosecution were unlawful and retaliatory. (FASC ¶¶ 57–64.) Plaintiff alleges that Garofolo was at all relevant times "the Chief of Police and a final policymaker for [WWTPD] on law-enforcement matters." *See Santiago v. Warminster Tp.*, 629 F.3d 121, 135 (3d Cir. 2010) (citing *McGreal v. Ostrov,* 368 F.3d 657, 685 (7th Cir. 2004) ("[T]he plaintiff must first allege that a defendant is a final policymaker. Only then can a court proceed to the next question of whether the single act or single decision of that defendant constituted municipal policy.")). "The relevant policymaker under New Jersey law in *Monell* cases involving alleged police misconduct is the police chief." *Kelley v. Reyes*, 2026 WL 948278, at *3, n.1 (D.N.J. Apr. 8, 2026) (citing *Hernandez v. Borough of Palisades Park Police Dep't*, 58 F. App'x 909, 913 (3d Cir. 2003)); *see also* N.J.S.A. § 40A:14–118 (where position of Chief of Police is established, this position "shall be the head of the police force and . . . shall be directly responsible to the appropriate [municipal governing] authority for the efficiency and routine day-to-day operations

thereof"). The Court finds that Plaintiff has sufficiently alleged Garofolo, as a policymaker for the Township on law enforcement matters, effectuated a custom or practice when he allegedly approved the arrest and prosecution of Plaintiff after Jones "had run the case by [him.]" (FASC ¶ 60.)[4]

The Court turns to the next step of its inquiry — whether Plaintiff has alleged that the Township violated Plaintiff's constitutional rights in connection with Garofolo's approval of the April Arrest and ensuing prosecution. In essence, Plaintiff theorizes that the April Arrest constituted wrongful and/or retaliatory misconduct by Jones, Garofolo, and the WWTPD, which was motivated by the fact that Plaintiff filed a complaint regarding the WWTPD's, and particularly Jones' April 4, 2023 response to the purported domestic violence dispute involving Plaintiff. Plaintiff alleges that the arrest and prosecution were carried out without probable cause because: (i) Vicente made a statement to Jones on April 20, 2023 wherein she "denied Plaintiff assaulted her and stated, in substance, 'He doesn't . . . put his hands on me,' and described the April 4 events as involving a struggle over keys, (FASC ¶¶ 52–56); and (ii) video recordings that did not support the charged offenses, (*id.* ¶¶ 39-41.) The Court has already concluded that Plaintiff has failed to allege that probable cause was lacking for the April Arrest.

The Court will dismiss Count VIII against the Township without prejudice.

*c) The County's Motion*

The County similarly moves to dismiss Count VIII on the basis that the FASC fails to support or establish the existence of any of the purported customs or policies that Plaintiff claims were violated. (County Moving Br. at 5–6.) Plaintiff alleges that the County "maintained a pattern,

---

[4] Plaintiff also alleges that the August Arrest was retaliatory due to his notice of tort claim to the County. (FASC ¶ 140.) Unlike Plaintiff's claim regarding the April Arrest — which was allegedly approved by Garofolo — the Court dismisses this claim because Plaintiff fails to identify any policy, custom, or practice relevant to the August Arrest to impose municipal liability.

practice, and custom that was a moving force behind the constitutional violations alleged," such as "tolerating intimidation and threats by jail staff against detainees who complain"; "maintaining deficient practices for promptly identifying involved staff when complaints arise"; "failing to preserve evidence when litigation is foreseeable, including delayed OPRA responses"; and "maintaining constitutionally inadequate procedures for return of seized property to detainees." (FASC ¶ 141.) Specifically, Plaintiff alleges that the County maintains policies (a) tolerating intimidation and threats by jail staff against detainees who complain, (b) maintaining deficient practices for properly identifying involved staff, (c) failing to preserve evidence when litigation is foreseeable, and (d) maintaining inadequate procedures for the return of seized property to detainees. (FASC ¶ 141.) As for the unconstitutional conduct that violates these purported policies, Plaintiff cites the Jail Threat, (County Opp'n Br. at 10–11), (FASC ¶ 99), and the purported delayed, obfuscating, and impeding tactical response to Plaintiff's OPRA request for identifying information of on-duty jailhouse officers, (*id.* at 12), (FASC ¶¶ 100-04.) Plaintiff believes that conduct "supports an inference of a custom or policy of protecting officers who retaliate against complainants." (*Id.*)

The County contends that its alleged conduct is not unconstitutional and alternatively is protected by the doctrine of qualified immunity. (*Id.*) In addition, the County avers that Plaintiff is "precluded from proceeding with a State OPRA-related claim in federal court" because Plaintiff "admittedly selected his remedy with regard to [the County's responses to his OPRA request for records identifying on-duty Corrections Police Officers] by filing a complaint with the New Jersey Government Records Council." (County Reply Br. at 4–5 (citing N.J.S.A. 47:1A-6 for the proposition that *either* a Government Records Council complaint or Superior Court litigation can be pursued); (*see* County Moving Br. at 9–11.) In opposition, Plaintiff argues that the County

corrections sergeant's explicit threat of physical violence to Plaintiff constitutes a violation of the First Amendment. (County Opp'n Br. at 10–11 (citing FASC ¶ 93).) As for the County's assertions of qualified immunity, Plaintiff states that the qualified immunity doctrine is inapplicable to municipalities or alternatively fails to shield the County from liability. (*Id.* at 11.) In response to the County's argument about the existence of a relevant policy, Plaintiff simply states that the FASC recites policies "tied to specific alleged conduct." (*Id.* at 11–12.) Finally, Plaintiff contends that the County's OPRA-preclusion argument is a red herring because it does not preclude claims based on federal constitutional violations.

The Court will dismiss Plaintiff's *Monell* claim against the County because Plaintiff does not allege a custom, policy, or practice of the County to warrant the imposition of municipal liability. *See McTernan*, 564 F.3d at 658. Purportedly tolerating intimidation and threats by jail staff against detainees who complain, maintaining deficient practices for properly identifying involved staff, failing to preserve evidence when litigation is foreseeable, and maintaining inadequate procedures for the return of seized property to detainees, (FASC ¶ 141), do not constitute customs or policies within the scope of Section 1983 — these are simply allegations of broad deficiencies that mimic Plaintiff's principle claims. Plaintiff alleges no official acts of decisionmakers or real policies to support his claims, and Plaintiff's generalized recitation of these 'policies' cannot "'fairly be said to represent official policy,' warranting the imposition of municipal liability." *McTernan*, 564 F.3d at 659 (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986) (quoting *Monell,* 436 U.S. at 694)). Plaintiff's municipal liability claims against the County based on the alleged threat from the corrections officer to Plaintiff on August 25, 2025 and the County's response to Plaintiff's OPRA request are unsustainable because Plaintiff fails to identify any customs or policies that buttress this conduct.

Even if Plaintiff were to have plausibly alleged customs or policies directing the relevant conduct, Plaintiff also fails to show that the County violated his constitutional rights. It is well-established that "mere threatening language and gestures [ ] fail to rise to the level of a constitutional violation." *Douglas v. Marino*, 684 F. Supp. 395, 397 (D.N.J. 1988) (internal quotations omitted) (distinguishing between allegations (a) where a corrections officer merely uses threatening words towards a detainee, which does not rise to a constitutional violation, and (b) where "the alleged altercation was *words along with action*, the action being the threatening use of a weapon" in close proximity to the detainee) (emphasis added) (citing *McFadden v. Lucas,* 713 F.2d 143, 146 (5th Cir.), *cert. denied,* 464 U.S. 998 (1983)); *see Moore v. Carbon County Correctional Facility*, 2020 WL 1486845, at *5 (M.D. Pa. Jan. 10, 2020) ("Mere words spoken to a prisoner by a correctional officer, even when those words are harsh, do not amount to a violation of the prisoner's civil rights by the officer."); *Collins v. Bopson*, 816 F.3d 335, 341 (E.D. Pa. 1993) (finding that an "alleged action of holding a baton to discourage Plaintiff from defending himself against the alleged beating or to discourage Plaintiff from assaulting the corrections officers fails to state a claim because 'mere threatening . . . gestures of a custodial officer do not, even if true, amount to constitutional violations.'") (quoting *McFadden*, 713 F.2d at 146).

To the extent Plaintiff's *Monell* claim against the County is based on the corrections officer's threatening words, (FASC ¶ 99), Plaintiff's claim will be dismissed with prejudice.

Turning to Plaintiff's claim regarding the County's purportedly insufficient response to Plaintiff's OPRA request for identifying information of on-duty jailhouse officers, (*id.* at 12), (FASC ¶¶ 100-04), the Court finds that these allegations do not establish a *Monell* claim against the County. First, Plaintiff does not allege that the County failed to respond to his OPRA Request. Rather, Plaintiff alleges that the County "failed or refused to meaningfully identify the individual"

responsible for the verbal threat to Plaintiff, (*id.*), and that "the County used reference-number handling, 'duplicate request' characterizations, and/or other administrative tactics that delayed or impeded timely production and meaningful identification[,]" (*id.*) But the County has no affirmative duty to "meaningfully identify the individual" that allegedly threatened Plaintiff on August 25, 2025 (the jail threat), particularly because Plaintiff does not even allege that he requested that the County identify that individual in his OPRA request. (*See id.* ¶ 100 (Plaintiff allegedly requested "intake/Receiving & Discharge rosters, logs, and related records").) These allegations are consistent with the County's arguments. (County Moving Br. at 6 ("Plaintiff has received government records identifying the CPOs on duty on the dates in question.").) The Court is satisfied that Plaintiff's *Monell* claim against the County cannot survive to the extent it is based on the OPRA request and the County's response because Plaintiff fails to allege that the County failed to provide requested records or otherwise violated his constitutional rights.

As such, the Court need not reach the questions of qualified immunity, whether the County maintains any applicable policies, or whether Plaintiff's claim regarding the OPRA response is even actionable pursuant to N.J.S.A. 47:1A–6.

The Court will dismiss Count VIII against the County without prejudice.

6. <u>Count XIV – Failure to Intervene / Supervisory Liability (against Garofolo and John Doe Officers 1-10)</u>

Plaintiff brings a failure to intervene claim against Garofolo, allegedly for his failure to intervene in, and prevent, constitutional violations. Garofolo moves to dismiss this claim on the basis that Garofolo did not owe a duty to intervene in the April Arrest. (Township Moving Br. at 28–29.) Plaintiff opposes, citing to the FASC's allegation that Garofolo's failure to intervene spanned from the April Arrest through the ensuing 20-month prosecution. (Township Opp'n Br. at 19–20.)

To establish a Fourth Amendment violation for failure to intervene, a plaintiff must show that the officer: (1) had a duty to intervene, (2) had a reasonable opportunity to intervene, and (3) failed to intervene. *Smith v. Mensinger*, 293 F.3d 641, 650–51 (3d Cir. 2002). While the parties dispute whether Garofolo had a duty to intervene in the April Arrest or the ensuing 20-month prosecution, those arguments pre-suppose that the underlying conduct was unconstitutional — of course, Plaintiff's claim is specifically based on the allegation that Garofolo knew of ongoing unconstitutional conduct. To that end, the Court has not identified any instance of conduct rising to the level of a constitutional violation in connection with the April Arrest and related prosecution, *see supra*, Point IV(A)(7)(b). Plaintiff's failure to allege an underlying constitutional violation is fatal to his failure to intervene claim against Garofolo.

The Court will dismiss Count XIV of the FASC without prejudice.

7. Counts IX & XII – Conspiracy to Deprive Civil Rights (against Jones, Garofolo, Marcotte, Ward, Hilton, and John Does) (against Ward and Hilton for non-advocacy administrative conduct only), and Violation of the New Jersey Civil Rights Act (N.J.S.A. 10:6–1 et seq.)

Plaintiff brings claims against Jones, Garofolo, Marcotte, Ward, and Hilton for conspiracy to deprive him of his civil rights under Section 1983. For his claim alleging violations of his civil rights under the New Jersey Civil Rights Act ("NJCRA"), Plaintiff does not identify any particular defendant and instead brings this cause of action against "individual governmental defendants."

"To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law reached an understanding to deprive him of his constitutional rights." *Harvard v. Cesnalis*, 973 F.3d 190, 207 (3d. Cir. 2020) (quoting *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 293-94 (3d Cir. 2018)). "After a plaintiff establishes that the object of the conspiracy was the deprivation of a federally protected right, 'the rule is clear that' the plaintiff 'must provide some factual basis to support the existence of the elements of a conspiracy:

agreement and concerted action.'" *Jutrowski*, 904 F.3d at 295 (quoting *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 184–85 (3d Cir. 2009). "To show agreement, he must demonstrate that the state actors named as defendants in the[ ] complaint somehow reached an understanding to deny [the plaintiff] his rights, and in the absence of direct proof, that meeting of the minds or understanding or agreement to conspire can be infer[red] from circumstantial evidence." *Id.* (internal citations and quotations omitted). Thus, governing law necessarily requires an initial showing that a plaintiff's constitutional rights were violated to assess whether a conspiracy to deprive him of those rights occurred.

Jones, Garofolo, and Marcotte move to dismiss Count IX on the basis that the FASC "lacks factual content supporting an agreement or understanding." (Township Moving Br. at 32); (Marcotte Moving Br. at 14–17.); (*see* FASC ¶ 144 ("Plaintiff alleges Defendants reached an understanding to deprive Plaintiff of constitutional rights through coordinated conduct, including use of coached/contaminated witness information, solicitation/procurement/use of unlawfully intercepted communications, concealment/sidelining of victim-denial evidence, interference with a key witness's ability to provide favorable information, and retaliatory use of criminal process.").) As to Hilton and Ward, Plaintiff alleges that they "insulated a cooperating witness whose unlawful interceptions were solicited/used by police, thereby contributing to continuation of the violations." (FASC ¶ 145.) They move to dismiss on the basis of prosecutorial immunity. (Hilton Moving Br. at 6–9.)

At base, Plaintiff has failed to allege that his constitutional rights were violated by Jones, Garofolo, Hilton, or Ward. To be sure, the NJCRA "is modeled after 42 U.S.C. § 1983; therefore, a similar analysis may be made regarding any claim under the New Jersey Civil Rights Act." *D'Andrea v. U.S. Army Corps of Engineers*, 2023 WL 4103929, at *7 (D.N.J. June 20, 2023)

(citing *Armstrong v. Sherman*, No. 09–716, 2010 WL 2483911, at *5 (D.N.J. June 4, 2010) ("[T]he language of the New Jersey Civil Rights Act, like the language of 42 U.S.C. § 1983, appears to grant a cause of action only to those persons whose rights have been personally violated.")). The Court has addressed each of Plaintiff's Section 1983 claims above and found each claim to be futile. Mere conclusory allegations that Plaintiff's constitutional rights were violated, or that a conspiracy occurred in furtherance of those violations, are insufficient to state a claim to survive a motion to dismiss. Plaintiff's failure to establish a constitutional violation forecloses his conspiracy and NJCRA claims.

The Court will dismiss Counts IX and XIII without prejudice.

### B. PLAINTIFF'S CONVERSION CLAIM (COUNT XV)[5]

In Count XV, Plaintiff makes a claim against the County for common law conversion. "The crux of conversion is wrongful exercise of dominion or control over property of another without authorization and to the exclusion of the owner's rights in that property." *Chicago Title Ins. Co. v. Ellis*, 409 N.J. Super. 444, 456 (App. Div. 2009). The only specific allegation Plaintiff makes in support of its conversion claim is that the County "exercised unauthorized control over Plaintiff's iPhone through prolonged retention beyond any reasonable evidentiary need and without adequate return procedures." (FASC ¶ 165.) The County argues that this contention is unsubstantiated because Plaintiff's iPhone simply was not in the County's possession, and regardless of that shortcoming, Plaintiff's claim is barred because he admittedly failed to correctly

[5] The Court notes that Plaintiff's conversion claim would otherwise be denied based on the parties' submissions relating to Plaintiff's August 2025 Notice of Claim, which exhibit indisputable evidence that Plaintiff failed to strictly comply with the notice and litigation filing requirements of the NJTCA. *See generally Guzman v. City of Perth Amboy*, 214 N.J. Super. 167 (App. Div. 1986) (failure to file notice within 90-day notice period under the NJTCA is an absolute bar to recovery). Plaintiff argues that he mailed the NTC, addressed to the Mercer County Clerk's Office, 240 W. State St., Trenton, NJ 08608 on September 16, 2025. (County Opp'n Br. at 14.) But the County provides, as a matter of public record, that the Mercer County Clerk is located at 209 South Broad Street, Trenton NJ, (County Reply Br. at 7 (citing Certification of Paul R. Adezio ("Adezio Cert. 2"), ECF No. 106-1, Exhibit B, which provides the correct address).)

file a tort claims notice. (County Moving Br. at 7.) The County elaborates that Plaintiff mailed the relevant Notice of Tort Claim ("NTC") to the Township and the County on September 16, 2025 to the wrong address, *see* N.J.S.A. 59:8-7, and thereafter filed the FASC well before the six-month "cooling off" period required by the New Jersey Tort Claims Act ("NJTCA"), *see* N.J.S.A. 59:8-8 ("After the expiration of six months from the date notice of claim is received, the claimant may file suit in an appropriate court of law."). (County Moving Br. at 7–8.) In the FASC, Plaintiff specifically alleges that the County disputes the validity of the NTC, but Plaintiff nonetheless alleges "substantial compliance, actual notice, [and] lack of prejudice". (FASC ¶ 9.) In other words, Plaintiff acknowledges he failed to fully comply with the notice and "cooling off" period requirements of the NJTCA.

Plaintiff's conversion claim cannot be sustained against the County because, as discussed *supra*, Point IV(A)(7)(c), Plaintiff admits in his opposition papers that his allegations relating to the purported unlawful seizure and retention of his iPhone stem from his August Arrest by WWTPD officers. (County Opp'n Br. at 9); (FASC ¶ 98).) Plaintiff has plainly failed to allege that the County is responsible for these officers' conduct (and thus the purported unlawful seizure and retention of his iPhone). (FASC ¶ 16.)

For the reasons set forth above, Plaintiff fails to plead a plausible claim that the County even possessed and/or retained his iPhone, let alone that the County wrongfully exercised dominion or control over the iPhone.

The Court will dismiss Count XV against the County without prejudice.

### C. PLAINTIFF'S WIRETAP CLAIMS (COUNTS X—XI) AND INTRUSION UPON SECLUSION CLAIM (COUNT XVI)

Plaintiff brings claims under the Federal Wiretap Act, 18 U.S.C. §§ 2511, 2520 ("FWA"), and the New Jersey Wiretap Act, N.J.S.A. 2A:156A–3 et seq. ("NJWA") against Marcotte and

Jones on the basis that Marcotte unlawfully recorded conversations in Plaintiff's apartment and Jones unlawfully procured those recordings for use in the Criminal Case. In tandem, Plaintiff brings a cause of action against Marcotte for intrusion upon seclusion under New Jersey common law.

The FWA addresses "oral communications" which mean "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication." 18 U.S.C. §§ 2510(a). Likewise, the NJWA protects against the interception, procurement, and disclosure of oral communications made with a justified expectation against interception. *See* N.J.S.A. 2A:156A–3; *Bradley v. Atl. City Bd. of Educ.*, 736 F. Supp. 2d 891, 899–900 (D.N.J. 2010); *White v. White*, 344 N.J. Super. 211, 221–23 (Ch. Div. 2001) (holding there was no actionable privacy violation where the plaintiff lacked an objectively reasonable expectation of privacy in the communication and setting at issue).

Marcotte argues that Plaintiff's wiretapping claims and intrusion upon seclusion claim fail because the FASC does not allege actionable intrusion, but rather "a neighbor recording sounds loud enough to travel through a shared wall and be heard from the adjoining unit." To be sure, Plaintiff and Marcotte did not share an apartment or the same living space — Plaintiff claims that Marcotte stated he had recordings "from inside of our apartment," (FASC ¶ 45), but also acknowledges that Marcotte "was Plaintiff's next-door neighbor," (*id.* ¶ 21.) The Court agrees with Marcotte that communications from inside Plaintiff's apartment on the purported recordings that Marcotte shared with Jones, (*id.* ¶¶ 42–51), are not protected oral communications under the FWA or the NJWA. Plaintiff could not have a justified expectation against interception of these communications if they could be heard between shared walls in an apartment complex by multiple

neighbors — notably, Plaintiff alleges in the FASC that Khan, another neighbor of Plaintiff, called 911 to report the dispute in Plaintiff's apartment. (*Id.* ¶ 31.) Because these communications had no justifiable expectation against interception, Plaintiff's claims against Jones are similarly not actionable.

The Court will dismiss Counts X, XI, and XVI with prejudice.[6]

**D. PLAINTIFF'S FIRST AMENDMENT CLAIM (COUNT XIII)**

Plaintiff asserts a claim that Hilton and Ward, through administrative actions, retaliated against him for his First Amendment-protected speech. Specifically, Plaintiff cites to Ward's May 31, 2024 closure of the Civil Complaint regarding Marcotte, and Hilton's purported ratification of that decision, constitute retaliation and deliberate indifference to Plaintiff's rights. (FASC ¶¶ 156–159.) Plaintiff alleges that these actions were taken to protect Marcotte as a cooperating witness in the Criminal Case. (*Id.*) Hilton and Ward move to dismiss this claim, arguing that their conduct is protected by absolute prosecutorial immunity. The Court agrees.

The only allegations in the FASC relating to Hilton or Ward describe their decisions not to investigate and prosecute Marcotte. (FASC ¶¶ 73–78.) It is well-settled that prosecutors enjoy common law absolute immunity from liability in civil suits for actions taken in their role as prosecutors. *Imbler v. Pachtman*, 424 U.S. 409, 427–28 (1976). That immunity is predicated on the notion that "harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* at 423. A prosecutor

[6] Marcotte also argues that these claims are barred by the relevant statutes of limitations. The Court agrees. *Smith v. Datla*, 461 N.J. Super. 82, 93–94 (App. Div. 2017) ("claims for invasion of privacy based on intrusion on seclusion are subject to the two-year statute of limitations imposed by *N.J.S.A.* 2A:14–2."). Plaintiff states in the FASC that he filed the Citizen Complaint based on Marcotte's unlawful recording of the April 4 Incident. (FASC ¶¶ 73–74.) Plaintiff therefore admittedly knew of Marcotte's recording activity at least as early as May 2024, more than two years before Plaintiff filed suit. Plaintiff's claims are thus barred for the additional reason that his claims are untimely.

subject to suit would become "constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages. *Id.* at 424–25. The prosecutor asserting immunity bears the burden of proving entitlement to that immunity. *Odd v. Malone*, 538 F.3d 202, 207 (3d Cir. 2008).

A prosecutor enjoys immunity for activities that are "intimately associated with the judicial process" and shields liability for any and all alleged wrongdoing that the prosecutor is alleged to have committed while acting as an advocate for the State. *Imbler*, 424 U.S. at 430; *see Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (affirming the principle that "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity"). "Three factors determine whether a government official should be given absolute immunity for a particular function: 1) whether there is "a historical or common law basis for the immunity in question;" 2) whether performance of the function poses a risk of harassment or vexatious litigation against the official; and 3) whether there exist alternatives to damage suits against the official as means of redressing wrongful conduct." *Kulwicki v. Dawson*, 969 F.2d 1454, 1464 (3d Cir. 1992). A prosecutor's decision whether to initiate a prosecution is at the core of their judicial role and activity subject to absolute immunity. *Buckley*, 509 U.S. at 272–73. A prosecutor's act of "evaluating the evidence and evaluating evidence is necessary to decide whether charges can be brought, evidence evaluation is an activity entitled to absolutely immunity." *Estate of Bardzell v. Gomperts*, Case No. 21-1906, 2022 WL 843483, *4 (3d Cir. March 22, 2022).

Plaintiff alleges that Hilton and Ward received and reviewed the Citizen Complaint, which contained Plaintiff's allegations of evidence of a crime. And that upon doing so, they decided not

to prosecute based on that evidence. (FASC ¶¶ 73–78.) Thus, Plaintiff concedes that Hilton and Ward conducted an "evaluation of facts in light of the elements of the crime, the source of those facts, the rules of evidence, and other legal considerations" (albeit coming to a different result than Plaintiff hoped for). *Gomperts*, 2022 WL 843483 at *4. Here, Hilton and Ward evaluated whether the evidence presented warranted prosecution and concluded that it did not. There is nothing untoward in the record leading them to that result. Accordingly, Hilton and Ward are entitled to absolute prosecutorial immunity for the conduct alleged in the FASC.

The Court will dismiss Count XIII with prejudice.

### E. PLAINTIFF'S STATE LAW CLAIMS AGAINST TOTO

Plaintiff asserts three claims against Toto: legal malpractice and breach of fiduciary duty (Count XVII), common law fraud (Count XVIII), and fraudulent concealment and equitable tolling (Count XIX). Toto moves to dismiss each of these claims.

Plaintiff claims Toto, as Plaintiff's attorney, committed legal malpractice and breached fiduciary duties to Plaintiff by failing to advise him of the NJTCA notice requirement despite knowing Plaintiff wanted to pursue related claims, misrepresenting a submission of Vicente's written statement in the Criminal Case, failing to challenge restrictions on the defense's access to Vicente in the Criminal Case, concealing the dismissal of the Criminal Case for approximately 227 days, and refusing to disclose insurance information to Plaintiff. Toto argues that Plaintiff's claims are summarily barred due to Plaintiff's failure to submit an Affidavit of Merit in connection therewith, and even if that does not bar his claims, Plaintiff has still failed to state a claim.

Plaintiff's claims against Toto are under state law, which are before the Court based on supplemental jurisdiction. "Supplemental jurisdiction allows federal courts to hear and decide state-law claims along with federal-law claims when they are so related to claims in the action

within such original jurisdiction that they form part of the same case or controversy." *Wisconsin Dept. of Corrections v. Schacht*, 524 U.S. 381, 387 (1998) (citation and internal quotation marks omitted). Where a district court has original jurisdiction pursuant to 28 U.S.C. § 1331 over federal claims and supplemental jurisdiction over state claims pursuant to 28 U.S.C. § 1367(a), the district court has discretion to decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3); *Growth Horizons, Inc. v. Delaware Cnty., Pa.*, 983 F.2d 1277, 1284–1285 (3d Cir. 1993).

Where a plaintiff's federal claims are dismissed at an early stage in the litigation, courts generally decline to exercise supplemental jurisdiction over state law claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *Growth Horizons, Inc.*, 983 F.2d at 1284–85. In this case, the Court is dismissing each of Plaintiffs' federal law claims on a motion to dismiss. The Court therefore exercises its discretion to decline supplemental jurisdiction over Plaintiff's remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3). *See First Ave. Realty, LLC v. City of Asbury Park*, Civ. No. 09-6321, 2013 WL 5913659, at *8 (D.N.J. Oct. 31, 2013).

Counts XVII–XIX will therefore be dismissed without prejudice.[7]

## V. CONCLUSION

For the reasons stated above, the Court will **DISMISS WITH PREJUDICE** the following claims: Counts III (regarding the August 2025 arrest) and VI (regarding the April 2023 arrest), Count VIII against the County (to the extent Count VIII is based on the corrections officer's alleged threatening words), and Counts X, XI, and XVI against Township Defendants, Marcotte, Hilton, and Ward, and Count XIII. The Court will **DISMISS WITHOUT PREJUDICE** the following

---

[7] Should Plaintiff wish to re-plead his claims against Toto, the Court directs the parties' attention to the U.S. Supreme Court's decision earlier this year that held that state laws requiring an affidavit of merit are preempted in federal court by Fed. R. Civ. P. 8: *Berk v. Choy*, 607 U.S. 187 (2026).

claims: Counts I, II, III (regarding the August 2025 arrest), Count IV (regarding the August 2025 arrest), Count V, Count VIII, Count IX, Count XIV, Count XV, Count XVII, Count XVIII, and Count XIX. The Court will grant Plaintiff leave to file a Second Amended Complaint, limiting to remedying the defects identified herein, within 30 days. An appropriate Order will follow.

Date: September 30, 2026

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**